**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| U.S. SECURITIES & EXCHANGE COMMISSION, *Plaintiff-Appellee*, <br><br> v. <br><br> JOCELYN M. MURPHY; MICHAEL S. MURPHY, *Defendants-Appellants*, <br><br> and <br><br> RICHARD C. GOUNAUD; RMR ASSET MANAGEMENT COMPANY; BRUCE A. BROEKHUIZEN; DOUGLAS J. DERRYBERRY; DAVID R. FROST; NEIL P. KELLY; JOHN M. KIRSCHENBAUM; DAVID S. LUTTBEG; TIMOTHY J. MCALOON; RALPH M. RICCARDI; DEWEY T. TRAN; PHILIP A. WEINER, *Defendants.* | No. 21-55178 <br><br> D.C. No. 3:18-cv-01895-AJB-LL |

U.S. Securities & Exchange
Company,

   *Plaintiff-Appellee*,

  v.

Richard C. Gounaud,

   *Defendant-Appellant*,

  and

Jocelyn M. Murphy; Michael S.
Murphy; RMR Asset
Management Company; Bruce A.
Broekhuizen; Douglas J.
Derryberry; David R. Frost;
Neil P. Kelly; John M.
Kirschenbaum; David S. Luttbeg;
Timothy J. McAloon; Ralph M.
Riccardi; Dewey T. Tran; Philip
A. Weiner,

   *Defendants.*

No. 21-55180

D.C. No.
3:18-cv-01895-
AJB-LL

OPINION

Appeal from the United States District Court
for the Southern District of California
Anthony J. Battaglia, District Judge, Presiding

Argued and Submitted May 20, 2022
Pasadena, California

Filed October 4, 2022

Before:  Kenneth K. Lee and Daniel A. Bress, Circuit Judges, and Sidney A. Fitzwater,* District Judge.

Opinion by Judge Lee;
Concurrence by Judge Lee

---

**SUMMARY**[**]

---

**Securities Law**

The panel affirmed the district court's judgment in favor of the Securities and Exchange Commission ("SEC") in its enforcement action against Jocelyn Murphy, Michael Murphy, and Richard Gounard ("Appellants") alleging violations of the Securities Exchange Act of 1934.

Appellants alleged they were not "brokers," and thus did not have to register with the SEC because their client, Ralph Riccardi, called the shots.  Appellants appealed the district court's liability and remedies orders.

The panel held that under the Exchange Act, the term "broker" encompassed much broader conduct: it included any person trading securities "for the account of others." 15 U.S.C. § 78c(a)(4)(A).    Because Appellants put Riccardi's capital at risk on their trades and acted as his agents, they behaved as "brokers" under the Exchange Act.

---

* The Honorable Sidney A. Fitzwater, United States District Judge for the Northern District of Texas, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

By not registering as brokers with the SEC, Appellants appeared as if they were merely retail investors (who receive priority for municipal bonds), allowing them to circumvent municipal bond purchasing order priority. The panel noted that its holding did not rely on the factors in *SEC v. Hansen*, No. 83 Civ. 3692, 1984 U.S. Dist. LEXIS 17835, at *25 (S.D.N.Y. Apr. 6, 1984), but several factors supported the decision. First, Appellants were compensated from trading profits, so they received transaction-based compensation. Second, Appellants regularly participated in securities transactions at key points in the chain of distribution. Lastly, Jocelyn Murphy actively solicited investors. The panel concluded that Appellants violated Section 15, the broker-registration provision, of the Exchange Act.

Jocelyn Murphy also made material misrepresentations in violation of § 10(b) and Rule 10b-5 when she lied about her zip code to obtain priority municipal bond allocation. The panel therefore affirmed the district court's liability order.

The panel affirmed the civil penalties imposed against Appellants. Though it appears that no individual investor suffered financial harm, Appellants' conduct undermined the SEC's system of broker-dealer oversight and circumvented retail priority regulations allowing municipalities to raise capital at the lowest possible price. The panel held that the record supported the district court's finding that Jocelyn Murphy committed 21 § 10(b) violations. In addition, the district court permissibly used the number of months Gounaud traded as an unregistered broker to calculate his total § 15 violations. Also, the district court did not abuse its discretion by declining to consider the Murphys' gross pecuniary gain or penalties imposed on

other defendants.  Finally, Appellants' civil penalties did not
violate the Eighth Amendment's Excessive Fines Clause.

The panel also affirmed the injunctive relief imposed
against Jocelyn and Michael Murphy, and therefore affirmed
the district court in full.

Judge Lee, joined by District Judge Fitzwater, concurred.
He wrote separately to highlight the perils of relying on
multifactor tests, and recommended jettisoning the *Hansen*
factors in future cases.

## COUNSEL

Robert Knuts (argued), Sher Tremonte LLP, New York,
New York; Thomas D. Mauriello, Mauriello Law Firm APC,
San Clemente, California; for Defendants-Appellants.

Rachel M. McKenzie (argued) and Jeffrey A. Berger, Senior
Litigation Counsel; Michael A. Conley, Acting General
Counsel; Securities and Exchange Commission,
Washington, D.C.; for Plaintiff-Appellee.

Richard C. Gounaud (argued), Chester, New Jersey, pro se
Defendant-Appellant.

## OPINION

LEE, Circuit Judge:

In popular culture, the word "broker" may evoke images of the likes of Leonardo DiCaprio in *The Wolf of Wall Street*: smooth-talking brokers pressuring uninformed clients into buying and selling worthless penny stocks so that they can bank massive commissions. Appellants Sean Murphy, Jocelyn Murphy, and Richard Gounaud insist that they are not "brokers"—and thus did not have to register with the Securities and Exchange Commission (SEC)—because they did not engage in such boiler-room tactics. Rather, their "client," Ralph Riccardi, called the shots. He provided them with capital to trade securities in exchange for a share of the profits and losses, and at times directed them to purchase certain municipal bonds.

But under the Securities Exchange Act of 1934, the term "broker" encompasses much broader conduct: it includes any person trading securities "for the account of others." 15 U.S.C. § 78c(a)(4)(A). Because Appellants put Riccardi's capital at risk on their trades and acted as his agents, they behaved as "brokers" under the Exchange Act. And by not registering as brokers with the SEC, Appellants appeared as if they were merely retail investors (who receive priority for municipal bonds), allowing them to circumvent municipal bond purchasing order priority. Appellants thus violated Section 15, the broker-registration provision, of the Exchange Act. Jocelyn Murphy also made material misrepresentations in violation of § 10(b) and Rule 10b-5 when she lied about her zip code to obtain high priority municipal bond allocations. We thus affirm the district court's liability order.

We also affirm the substantial civil penalties imposed against Appellants. Though it appears no individual investor suffered financial harm, Appellants' conduct undermined the SEC's system of broker-dealer oversight and circumvented retail priority regulations allowing municipalities to raise capital at the lowest possible price. We also affirm the injunctive relief imposed against the Murphys, and therefore affirm the district court in full.

## BACKGROUND

### I. Factual History

### a. A primer on the municipal bond market.

To understand how Appellants sidestepped the Exchange Act, we need to explain how the municipal bond market works. Municipalities issue bonds to raise capital for local projects such as roads, hospitals, and schools. Municipal bonds are usually issued through a "negotiated underwriting." Under this model, underwriting firms release a "pricing wire" to potential investors, who then commit to purchasing bonds. The pricing wire provides key terms about the bond offering, including the "order priority." The order priority defines how bonds will be allocated between various classes of investors. The order priority is significant because demand for municipal bond offerings usually outpaces supply. Investors with low priority may not receive bonds even if they place an order.

Historically, "retail investors" (*i.e.*, individual, non-professional investors) were crowded out of bond offerings by large, institutional investors such as mutual funds, hedge funds, and insurance companies. Underwriters gave institutional clients high priority because they comprised the largest share of the underwriters' profitability. Retail

investors, as a result, were often not allocated any bonds despite their interest.

This crowding out of retail investors hurts municipal bond issuers. Retail investors are often willing to purchase bonds at lower interest rates, while institutional investors usually demand a higher yield. Retail investors also rarely resell their bonds on the secondary market, which reduces supply and thus increases the issuer's initial pricing leverage. As a result, many issuers reserve the initial order period exclusively for retail investors. Within the retail order period, issuers often gave the highest priority to investors residing within the issuer's jurisdiction. To verify that an investor is a resident of the jurisdiction, issuers require purchasers to submit their residential zip code.

### b. RMR's bond-flipping scheme.

Sean and Jocelyn Murphy (who are husband and wife)[1], as well as Richard Gounaud, have decades of experience in the securities trading industry. In the late 2000s, they associated with Ralph Riccardi and his company, RMR Asset Management, to trade securities.

Riccardi gave Appellants his capital to trade via a prime brokerage arrangement. A prime brokerage provides a centralized way for clearing trades and settling funds across multiple accounts held with many executing brokers who process buy and sell orders of securities. *See Prime Broker Committee Request, SEC No-Action Letter*, 1994 WL 808441, at *1–2 (Jan. 25, 1994). Put differently, Riccardi provided the necessary capital to trade, and Appellants each

---

[1] To avoid confusion, we will use their first names to identify them in this opinion.

opened many accounts with executing brokers to gain access to many different municipal bond offerings. These accounts were in Appellants' own names but were linked to Riccardi's prime brokerage account because the trading names were registered to RMR. When Appellants bought and sold securities in their individual accounts, the transaction was reported to the prime brokerage's clearing agent. RMR would then affirm the trade, and the funds would settle.

Each trader orally agreed with Riccardi to split a percentage of the profits and losses resulting from their trades.[2] But this arrangement went one way only: Riccardi did not share profits and losses from his own trades with Appellants. None of the traders was paid a salary.

Riccardi and Appellants were so-called "bond flippers." They would purchase new-issue municipal bonds and immediately resell those bonds on the secondary market at a profit. Generally, Riccardi would try to buy the allotment himself so that he would not have to share any trade profits with Appellants. But if demand for the bond was greater than what Riccardi was allowed to buy through his own accounts, he would ask that Jocelyn—and sometimes Sean or Gounaud—seek an allotment through their own accounts. This is why Riccardi allowed Appellants to trade with his capital: more traders meant more accounts, which in turn meant that RMR could "[i]ncrease the amount of bonds that we could get on any given issue."

While associated with Riccardi and RMR, Appellants executed thousands of transactions. According to Riccardi's

---

[2] Typically, Appellants received between 50% and 60% of profits (or losses) but received 33% when another RMR-affiliated trader was involved in the transaction.

prime brokerage trade blotter, Sean executed 10,179 trades, including 399 involving new-issue municipal bonds; Jocelyn made 6,407 trades, including 2,410 involving new-issue municipal bonds; and Gounaud conducted 2,250 trades, including 360 involving new-issue municipal bonds.  And on at least 21 occasions, Jocelyn Murphy provided underwriters with false zip codes within the issuer's jurisdiction, despite residing elsewhere, to obtain the highest priority during the retail order period.

### c. The SEC files an enforcement action against Appellants.

In August 2018, the SEC sued RMR, Riccardi, the Murphys, Gounaud, and nine other traders.  Though bond flipping is not itself illegal, the SEC alleged that Riccardi, through RMR, ran a "long-running fraudulent scheme" to circumvent municipal bond order priority by "operating as unregistered brokers" to appear as retail investors and fill orders on behalf of institutional customers in exchange for a "pre-arranged commission, usually one dollar per bond."

The SEC alleged that Appellants violated § 15(a) of the Securities Exchange Act of 1934, which prohibits any "broker" from "effect[ing] any transactions in . . . any security . . . unless such broker . . . is registered."  15 U.S.C. § 78o(a)(1).  Section 15(a)'s broker registration requirement "serves as the 'keystone of the entire system of broker-dealer regulation'" because a registered broker must "abide by numerous regulations designed to protect prospective purchasers of securities."  *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) (quoting *Frank W. Leonesio*, Exchange Act Release No. 23,524, 36 SEC Docket 457, 464 (Aug. 11, 1986)).  The SEC argued that Appellants violated § 15(a) by "plac[ing] orders for and purchas[ing] new issue bonds from underwriters at Riccardi's direction and under his

supervision," using Riccardi's capital, without "register[ing] with the Commission as a broker-dealer or associated person of a registered broker-dealer."

The SEC separately alleged that Jocelyn Murphy violated § 10(b) of the Exchange Act and Rule 10b-5. Section 10(b) prohibits the use "in connection with the purchase or sale" of a security of "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ." 15 U.S.C. § 78j(b). The SEC promulgated Rule 10b-5, which makes it unlawful "[t]o make any untrue statement of a material fact" in connection with a securities transaction. 17 C.F.R. § 240.10b-5(b). The SEC contended that Jocelyn violated § 10(b) and Rule 10b-5 by providing fraudulent zip codes in connection with the purchase and sale of municipal bonds.

### d. The district court grants summary judgment for the SEC, finding that Appellants violated § 15(a) and § 10(b).

All RMR trader-defendants besides the Murphys and Gounaud settled with the SEC. The SEC then moved for summary judgment on liability against Appellants, which the district court granted.

The district court held that Appellants, based on the totality of circumstances, were "brokers" under § 15(a) of the Exchange Act and thus violated the law by failing to register as brokers. The district court relied on the so-called *Hansen* factors, which examine whether the defendant

> (1) is an employee of the issuer of the security; (2) received transaction-based income such as commissions rather than a

> salary; (3) sells or sold securities from other issuers; (4) was involved in negotiations between issuers and investors; (5) advertised for clients; (6) gave advice or made valuations regarding the investment; (7) was an active finder of investors; and (8) regularly participates in securities transactions.

*SEC v. Feng*, 935 F.3d 721, 732 (9th Cir. 2019) (alteration in original) (citation omitted) (applying *SEC v. Hansen*, No. 83 Civ. 3692, 1984 U.S. Dist. LEXIS 17835, at *25 (S.D.N.Y. Apr. 6, 1984)).

First, the court noted that Appellants "engaged in regularity of participation in securities transactions" for Riccardi. Each Appellant linked his or her executing broker accounts with Riccardi's prime brokerage account and used his capital to purchase securities. While the Appellants technically controlled their accounts, there were "several exhibits that contain emails establishing that Riccardi and RMR directed [Appellants] to purchase securities."

Second, Appellants "received transaction-based compensation for their trading activities." Though Appellants shared profits *and losses* with Riccardi and received no compensation if the trade was unprofitable, the district court was not persuaded that "this form of compensation is different."

The district court then held that Jocelyn Murphy violated § 10(b) and Rule 10b-5 by providing fraudulent zip codes when buying new-issue municipal bonds. Jocelyn "admitted that without providing these false zip codes, she would not have . . . received the highest priority," and the SEC "provided unrebutted expert testimony that local zip codes are important to issuers of new municipal bonds." Jocelyn

also acted with the requisite scienter—knowledge—because she knew (1) "that she did not reside in these zip codes," and (2) that "failing to provide a zip code from these jurisdictions would not place her in the highest priority period."

### e. The district court imposes substantial civil penalties against all Appellants and injunctive relief against the Murphys.

The SEC requested civil monetary penalties and injunctive relief against Appellants. For each "violation" of the Exchange Act, a penalty may be imposed up to the greater of either (1) a fixed statutory amount, or (2) the gross pecuniary gain to the defendant. *See* 15 U.S.C. § 78u(d)(3)(B)(ii). District courts may also impose injunctions against any person who "is engaged or is about to engage in acts or practices" that violate the Exchange Act. *See* 15 U.S.C. § 78u(d)(1).

The SEC requested fixed Tier 1 civil penalties for each month that Sean Murphy (65 months) and Richard Gounaud (46 months) traded securities as unregistered brokers, for total requested penalties of $523,863 and $385,641, respectively. For Jocelyn Murphy, the SEC requested fixed Tier 2 civil penalties for her 21 § 10(b) violations—each instance in which Jocelyn provided fraudulent zip codes—for a total penalty of $1,761,920. The SEC did not request additional penalties for Jocelyn's § 15(a) violations.

The SEC also requested that (1) each Appellant be specifically enjoined for ten years "from opening or maintaining any brokerage account without providing the brokerage firm a copy of the Complaint and Final Judgment in this case," (2) each Appellant be permanently enjoined against "future violations of Section 15(a)," and (3) Jocelyn

individually be enjoined against "further violations of . . . Section 10(b) and Rule 10b-5."

The district court then addressed the nature of each Appellant's conduct to determine the proper penalties, applying the factors set forth in *SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980). Under *Murphy*, "a court must assess the totality of the circumstances surrounding the defendant and his violations," considering factors such as (1) the degree of scienter, (2) the isolated or recurrent nature of the infraction, (3) the defendant's recognition of the wrongful nature of his conduct, (4) the likelihood, because of the defendant's occupation, that future violations might occur, and (5) the sincerity of his assurances against future violations. 626 F.2d at 655.

### i.  Sean Murphy

The district court applied "a modest twenty percent reduction" to the SEC's requested civil penalty leading to a total penalty of $414,090.40 against Sean Murphy.  The district court also granted the requested injunctive relief but reduced the duration of the specific injunction from ten to five years given the substantial civil penalties imposed.

### ii.  Richard Gounaud

Gounaud's conduct under the *Murphy* framework was identical to Sean Murphy's, except that Gounaud presented a lower risk of future securities violations because he no longer trades securities.  The district court likewise applied a twenty percent reduction, resulting in a civil penalty of $308,512.80.  But the district court declined to impose any injunctions because Gounaud "is approaching 70 years old" and "has no intention of trading securities in the future."

### iii. Jocelyn Murphy

The district court imposed the full requested civil penalty—$1,761,920—against Jocelyn Murphy. The district court also granted the requested injunctions, but as with Sean, exercised its discretion to reduce the duration of the specific injunction from ten to five years considering the significant civil penalties imposed. Most of the *Murphy* factors favored a full penalty. Jocelyn "knowingly" provided false zip codes—a high degree of scienter. Her violations were recurrent. And her admission of wrongdoing was less than convincing. And Jocelyn equivocated "regarding her future in the securities business," and her husband still trades securities, signaling to the court that Jocelyn "may renew her professional trading and that future violations might occur."

Appellants then appealed the district court's liability and remedies orders.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment on § 15(a) and § 10(b) liability de novo, *see Feng*, 935 F.3d at 728, and the district court's remedies decision for an abuse of discretion. *See Murphy*, 626 F.2d at 657. But we evaluate legal issues, such as whether a remedy violates a statute or the Constitution, de novo. *See United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1121 (9th Cir. 2004) (reviewing de novo whether civil penalty violates the Eighth Amendment); *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1030, 1047–48 (9th Cir. 2013) (reviewing de novo whether permanent injunction violates Federal Rule of Civil Procedure 65(d)'s "specificity" requirement).

## DISCUSSION

**I.  We affirm the district court's summary judgment for SEC on Exchange Act § 15(a) and § 10(b) liability.**

    **a.  Appellants violated § 15(a) by acting as unregistered "brokers."**

Section 15(a) of the Exchange Act bars any "broker" from trading securities without registering with the SEC. 15 U.S.C. § 78o(a)(1).  The Exchange Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A).  The SEC has not issued regulations further clarifying this definition.  But in evaluating whether someone is a "broker," the SEC and courts (including the district court here) have generally employed a "totality-of-the-circumstances approach," relying on the non-exclusive *Hansen* factors.  *See, e.g.*, *Feng*, 935 F.3d at 731–32.  An SEC official has noted that this approach is "fairly fact intensive" and creates a "broad" test for broker-dealer registration.  *See* David W. Blass, *A Few Observations in the Private Fund Space*, U.S. Securities and Exchange Commission (Apr. 5, 2013), https://www.sec.gov/news/speech/2013-spch040513dwghtm#P42_12529.

We find it more straightforward to begin our analysis with the statutory text rather than the *Hansen* factors.  Those factors are simply a judicial effort to provide meaning to the statutory text, and they are more directly applicable in cases involving more traditional brokerage arrangements, where the broker is not bearing any risk of loss.  *See, e.g.*, *Feng*, 935 F.3d at 732 (receiving an upfront fee and commission for completing transaction).  Indeed, we have made clear that the *Hansen* factors are "non-exclusive."  *Feng*, 935 F.3d at 732 (quoting *SEC v. Collyard*, 861 F.3d 760, 766 (8th Cir.

2017).  And the text of the Exchange Act itself provides considerable guidance on its own.  *See Feng*, 935 F.3d at 731–33 (conducting, but not requiring, analysis under the *Hansen* factors); *see also Williams v. Taylor*, 529 U.S. 420, 431 (2000) ("We start, as always, with the language of the statute.").

Under the statute, a "broker" is anyone who trades securities "for the account of others."   15 U.S.C. § 78c(a)(4)(A).  Appellants, however, contend that they did not trade "for the account of others" because they (1) shared profits *and losses* with Riccardi on each trade, (2) had complete discretion over which trades to make, and (3) traded in "partnership" with Riccardi and so were "principals," not "agents."  We reject these arguments.

First, Appellants made trades for "the account of [Riccardi]" because they put Riccardi's capital at risk on every trade they made.  *Id.*  If the trade was unprofitable, Riccardi would bear a portion of the loss.  When someone acts "on one's own account," he or she acts "at one's own risk."   *Account*, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/account.   Conversely, if someone acts "on the account of *others*," another person assumes the risk for the actions.  So when Appellants traded securities and shared a portion of the profits and losses with Riccardi, they traded for his account because another person—Riccardi—bore some risk of a loss.

We find support for this interpretation of "account" in an analogous provision of the Exchange Act—§ 11(a).  Section 11(a) prohibits a stock exchange floor broker from making transactions on the exchange "for its own account." 15 U.S.C. § 78k(a)(1).  The Third Circuit agreed with the SEC that a floor broker trades for his/her own account when he/she "shares in the economic risks of trades," or, in other

words, has a "compensation arrangement that results in [the broker] sharing in the trading performance." *See Levine v. SEC*, 407 F.3d 178, 183–84 (3d Cir. 2005); *accord In re New York Stock Exchange*, Exchange Act Release No. 41574. 70 SEC Docket No. 106 (June 29, 1999). Section 11(a) and § 15(a) are both part of the Exchange Act, so we presume "account" as used in both provisions has the same meaning. *See United States v. Lopez*, 998 F.3d 431, 437 (9th Cir. 2021). And because Riccardi "share[d] in the economic risk[s] of [Appellants'] trades," Appellants traded for his account.

Of course, Appellants also bore a portion of the risk on each trade. So they also made trades for their own accounts, so to speak. But there is no requirement in § 15(a) that a "broker" must trade *exclusively* for the account of others. Though it is atypical for brokers to assume a portion of the trading risk, this does not remove Appellants' conduct from the ambit of § 15(a). Because Appellants made trades for the account of one other person besides themselves—here, Riccardi—they fall within the statutory definition of "broker" under § 15(a).[3]

Second, Appellants traded "for" Riccardi because they acted as his "agents." An "agent" is "one who is authorized to act *for* . . . another." *Agent*, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/agent (emphasis added); *see also United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010) ("An agent is one who

---

[3] The Murphys argue that § 15(a) requires a broker to transact for at least two other persons because the statute uses the plural "others." But under the Dictionary Act, "words importing the plural include the singular" unless context suggests otherwise. 1 U.S.C. § 1. There is no evidence that Congress intended to exclude the singular "other" from § 15(a)'s use of "others."

'[a]cts on the principal's behalf and subject to the principal's control.'" (quoting Restatement (Third) of Agency § 1.01)). And brokers are typically equated with agents. *See Sec. Indus. Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*, 468 U.S. 207, 218 (1984) ("[A] broker executes orders for the purchase or sale of securities solely as agent.").

Riccardi authorized Appellants to trade securities on his behalf and with his capital, subject only to volume limits. The record brims with examples of Riccardi directing Appellants to buy certain bonds and Appellants complying. In short, considerable evidence shows that Appellants acted on Riccardi's behalf and subject to his control. *Bonds*, 608 F.3d at 506.

To be sure, Appellants and Riccardi testified that Appellants had complete discretion to trade as they pleased and were "never obligated to buy" the bonds requested by Riccardi. But Appellants have provided no evidence that they ever declined to purchase a bond requested by Riccardi, which belies their claim of complete discretion. Although Appellants made some trades independent of Riccardi, this does not negate that when Riccardi directed Appellants to place a trade, they complied.

Still, Appellants argue that they were not Riccardi's "agents," but were his "partners." And because they were partners, Appellants say they acted as principals instead of agents when they bought securities. Even if a partnership existed, that would not alter our conclusion that Appellants acted as agents. In a partnership, "[e]ach partner is an agent of the partnership for the purpose of its business." Cal. Corp. Code § 16301(1); *see also Karrick v. Hannaman*, 168 U.S. 328, 334 (1897) (A partnership "is, in effect, a contract of mutual agency, each partner acting as a principal in his own behalf and as agent for his co-partner."). And "[a]

partnership is an entity distinct from its partners." Cal. Corp. Code § 16201. Assuming a partnership existed, Appellants traded securities as agents of the partnership—an entity distinct from Appellants—and thus traded "for the account of [the partnership]." *See* 15 U.S.C. § 78c(a)(4)(A).

In any event, Appellants have not proved that a partnership in fact existed. They claim that a partnership is presumed because they shared profits and losses with Riccardi. *See* Cal. Corp. Code § 16202(c)(3)(B). But Appellants neglect an important qualification: profit sharing creates a partnership presumption *unless* "profits were received . . . [in] payment for services as an *independent contractor*." *Id.* (emphasis added). When the Murphys were first deposed by the SEC in 2016, they testified that they were "independent contracto[rs]" for RMR. (Jocelyn: "I'm an independent contractor . . . [f]or RMR Group."); (Sean states three times: "I'm an independent contractor for RMR."). And in Gounaud's response to an SEC questionnaire, he claimed to be self-employed and "associated with Ralph Riccardi," but did not claim to be in a partnership.

Despite these prior statements under oath, all three Appellants changed tune at their 2019 depositions and testified that they were partners with Riccardi. But a "party cannot create a genuine issue of material fact to survive summary judgment by contradicting his earlier version of the facts." *Block v. City of Los Angeles*, 253 F.3d 410, 419 n.2 (9th Cir. 2001). Moreover, Riccardi at his 2019 deposition maintained that he "never perceived [Appellants] as anything other than independent contractors." And Appellants have offered no objective evidence, such as a written partnership agreement or Schedule K-1 reporting

partnership income, to prove the existence of a partnership.[4] Thus, the district court correctly held that the defendants provided no evidence that a partnership existed "other than self-serving declarations."

In sum, we hold that when someone places another's capital at risk by trading securities as his or her agent, he or she is trading securities "for the account of others," and is a "broker" subject to § 15(a)'s registration requirements.[5] 15 U.S.C. § 78c(a)(4)(A). Because Appellants bought municipal bonds at Riccardi's direction, with Riccardi's capital, and shared a portion of the trading risk with Riccardi, they traded for Riccardi's account as brokers. The defendants violated § 15(a) by failing to register with the SEC. We thus affirm the district court's summary judgment order finding Appellants liable under § 15(a).[6]

---

[4] Gounaud says the district court erred by focusing on the lack of a Schedule K-1 because partnerships are eligible to elect out of Subchapter K-1 in their first year of existence. If they make such an election, then each partner reports his or her share of partnership income on their individual tax returns. *See* 26 C.F.R. § 1.761-2(b)(2)(ii). But there is no evidence that the partnership elected out of Subchapter K.

[5] The Murphys argue that the "rule of lenity" should be applied to their conduct. But even assuming it applies with equal force in a civil case such as this, the rule of lenity applies only if the statute contains "grievous ambiguity" after using all traditional tools of statutory interpretation. *See Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016). For the reasons explained, § 15(a) is not ambiguous.

[6] Gounaud separately argues that § 15(a) is unconstitutionally vague because neither the statute nor any SEC regulation or guidance provided fair notice that his trading arrangement with Riccardi required him to register as a broker. This argument is foreclosed by our recent decision in *Feng* where we rejected a vagueness challenge to § 15(a) because the statute was "enacted 80 years ago, and it has been applied countless times

\* \* \* \* \*

Though our holding does not rely on the *Hansen* factors, we note that several factors support our decision. First, Appellants were compensated from trading profits, so they received transaction-based compensation. *See Persons Deemed Not To Be Brokers*, Exchange Act Release No. 22172, 33 SEC Docket 652 (June 27, 1985) (transaction-based compensation is a key indicator of broker activity). Transaction-based compensation can encourage "high pressure sales tactics" by the broker that conflicts with the interests of his or her client. *Id.* at \*4. Although the risk of abusive sales tactics is somewhat diminished here because Appellants had skin in the game, Riccardi still bore risk himself. One SEC official has explained that the SEC takes a broad view of transaction-based compensation: "compensation that depends on the *outcome* or size of the securities transaction" suggests broker status. Blass, *A Few Observations in the Private Fund Space* (emphasis added). In sum, even though Appellants shared risk, their compensation structure suggests broker activity.

Second, Appellants regularly participated "in securities transactions at key points in the chain of distribution." *SEC*

---

by the courts," which provides guidance to regulated parties. *Feng*, 935 F.3d at 734 n.8. Though we are unaware of any case that has applied § 15(a) to directly analogous conduct, Gounaud's conduct falls within the text of the statute. If Gounaud had concerns about the legality of his business arrangement, he could have requested clarification from the SEC in the form of a "No-Action Letter." SEC, *Division of Trading and Markets No-Action, Exemptive, and Interpretive Letters*, (Apr. 13, 2022), https://www.sec.gov/divisions/marketreg/mr-noaction.shtml; *see also Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (When a regulated party may "clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process," the law is subject to a "less strict vagueness test.").

*v. Holcom*, No. 12-cv-1623-H (JMA), 2015 U.S. Dist. LEXIS 189380, at *4 (S.D. Cal. Jan. 8, 2015) (citation omitted).  As "flippers," they were often conduits between the primary and secondary bond markets.  As the SEC's expert explained, the supply of municipal bonds available on the secondary market is limited because retail investors are given priority and such investors generally hold the bonds until maturity.

Lastly, Jocelyn actively solicited investors. *See Hansen*, 1984 U.S. Dist. LEXIS 17835, at *10 ("Hansen was an active and aggressive finder of investors.").  Jocelyn e-mailed institutional investors to solicit interest in municipal bond offerings to determine whether certain bonds were likely to trade higher on the secondary market.  This further supports that Jocelyn acted as a broker.

### b. By providing false zip codes, Jocelyn made "material misrepresentations" in violation of § 10(b) and Rule 10b-5.

Section 10(b) and Rule 10b-5 prohibit making a "material" misrepresentation in connection with the purchase or sale of any security.  17 C.F.R. § 240.10b-5(b); *see also* 15 U.S.C. § 78j(b).  Jocelyn admits that she knowingly provided false zip codes to underwriters to obtain the highest retail priority, but she still claims that such misrepresentations were not material.[7]

---

[7] A Rule 10b-5 violation has four elements: (1) a material misrepresentation or omission (2) in connection with the purchase or sale of a security (3) with scienter (4) in interstate commerce.  *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010). Jocelyn only disputes the "materiality" element.

A misrepresentation is "material" if there is a "substantial likelihood" that a "reasonable investor" would view it "as having significantly altered the 'total mix' of information." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). In other words, a misrepresentation is material if "under all the circumstances, the [misrepresented] fact would have assumed actual significance in the deliberations" of a reasonable investor. *TSC Indus.*, 426 U.S. at 449. But the misrepresented fact need not change the investor's plan. *Id.*

The SEC's expert explained, and Jocelyn agrees, that municipal bond issuers mainly rely on zip codes to determine retail order priority. Jocelyn's misrepresented zip codes were thus "actual[ly] significa[nt] in the deliberations" of reasonable investors—here, the municipal bond issuers— when allocating retail order priority. *Id*. at 449. Still, Jocelyn maintains that the misrepresentations were not material because (1) the bond underwriters had actual knowledge of her real zip code, as she provided her real zip code on her account registration forms, and (2) there is no evidence that the underwriters submitted the false zip codes to the issuers.

Jocelyn presents no evidence that the underwriters examined her account registration forms to cross-check the false zip codes she submitted. But even if we assume they had examined Jocelyn's forms, her argument fares no better. The underwriters would then be left with two zip codes— one real, and one fraudulent—with no apparent basis to discern truth from fraud. Jocelyn's misrepresentation would not "lose its deceptive edge simply by joinder with [a zip code] that [is] true." *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991).

Additionally, Jocelyn's misrepresentations were material even if they were not communicated to the issuers. Essentially, Jocelyn argues that the SEC has failed to prove that the issuers relied on her misrepresentations. But the SEC, unlike private parties, need not prove reliance when bringing a § 10(b) enforcement action. *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993) ("[R]eliance is not an element of a Rule 10b-5 violation by misrepresentation; rather, it is an element of a private cause of action for damages."); *see also Lorenzo v. SEC*, 139 S. Ct. 1094, 1104 (2019) (The SEC may "bring suit against certain securities defendants based on undisclosed deceptions."). It is enough that Jocelyn's misrepresentations *would be* significant if communicated to issuers and the misrepresentations were made in connection with the purchase of securities. We affirm the district court's order finding Jocelyn liable under § 10(b) and Rule 10b-5.

## II. We affirm the civil penalties against Appellants.

A district court has discretion to impose civil penalties so long as the amount is within the statutory maximum. *See United States v. ITT Continental Baking Co.*, 420 U.S. 223, 229 n.6 (1975); *SEC v. Loomis*, 17 F. Supp. 3d 1026, 1032 (E.D. Cal. 2014). "[C]ivil penalties are designed to deter the wrongdoer from similar violations in the future," and courts "apply the factors set forth in *SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980)" to determine the proper penalty. *SEC v. mUrgent Corp.*, SACV 11-0626 DOC (SSx), 2012 U.S. Dist. LEXIS 25626, at *6–7 (C.D. Cal. Feb. 28, 2012).

Appellants do not quarrel with the district court's analysis of any *Murphy* factors specifically. But they still insist that the district court abused its discretion and argue that their civil penalties are grossly excessive such that they

violate the Eighth Amendment's Excessive Fines Clause. We disagree.

### a. The district court did not abuse its discretion in determining Appellants' civil penalties.

### i. The record supports the district court's finding that Jocelyn committed 21 § 10(b) violations.

The district court found that Jocelyn committed 21 § 10(b) violations, equivalent to the number of times she provided false zip codes. Jocelyn argues that the record does not support the finding that she committed 21 violations because her § 10(b) liability turned on only three fraudulent transactions.

But at the remedies stage, the district court was not limited to the evidence considered in its liability order. Rather, the district court could consider more evidence to assess the full extent of Jocelyn's misconduct so long as the new evidence did not conflict with its liability findings. *See SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 781–82 (5th Cir. 2017) ("At the remedies stage, trial judges may make factual findings . . . in assessing the amount of civil penalties so long as the court's findings do not conflict with the jury's findings as to liability.").

To support its remedies motion, the SEC submitted evidence of 21 conversations in which Jocelyn provided underwriters with false zip codes. In her response to the SEC's motion, she even admits to communicating 21 false zip codes. The district court properly considered this other evidence at the remedies stage to gauge the full magnitude of Jocelyn's offense.

ii. **The district court permissibly used the number of months Gounaud traded as an unregistered broker to calculate his total § 15(a) violations.**

Gounaud committed 46 § 15(a) violations, according to the district court, because he traded as an unregistered broker for forty-six months. Gounaud claims that it was an abuse of discretion to define "each violation" as "each month" he traded as an unregistered broker because "[e]lapsed time is not a violation." Alternatively, Gounaud argues that the record does not support the district court's conclusion that he traded as an unregistered broker for 46 months.

The civil-penalty provision of the Exchange Act sets maximum penalties "for each violation," but does not define "violation." *See* 15 U.S.C. § 78u(d)(3)(B); *Life Partners*, 854 F.3d at 783. District courts have discretion to determine what constitutes a "violation" and have relied on various proxies. *See, e.g.*, *SEC v. StratoComm Corp.*, 89 F. Supp. 3d 357, 372 (N.D.N.Y. 2015) (Some courts "look to the number of investors defrauded or the number of fraudulent transactions," while others "consider the number of statutes . . . violated." (citations omitted)); *SEC v. Murray*, No. 12-cv-01288-EMC, 2016 U.S. Dist. LEXIS 162799, at *25 (N.D. Cal. Nov. 23, 2016) (Courts have looked to "the number of schemes in which the defendant was involved" or "the number of victims.").

The district court properly exercised its discretion in determining Gounaud's violations based on the number of months he engaged in unregistered broker activity. This decision was especially reasonable—and favorable to Gounaud—because the district court could have found thousands of violations if it had relied on the number of transactions Gounaud made as an unregistered broker. *See*

*SEC v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 288 n.7 (2d Cir. 2013) (finding "no error in the district court's methodology for calculating the maximum penalty by counting each late trade as a separate violation").

The record also supports the district court's finding that Gounaud traded as an unregistered broker for 46 months. Gounaud says that the record contains just 12 months of trading data, so no evidence supports the district court's finding. But Gounaud's trading logs, which were submitted to the district court, confirm 46 months of trading activity.

### iii. The district court did not abuse its discretion by declining to consider the Murphys' gross pecuniary gain or penalties imposed on other defendants.

The Murphys argue that the district abused its discretion by refusing to compare the size of their penalties to (1) the gross pecuniary gain from their violations, and (2) the penalties imposed on the other RMR defendants and defendants in separate enforcement actions accused of similar violations. The district court did not have to conduct either comparison.

The civil penalty provision of the Exchange Act authorizes per violation penalties based on *either* a fixed statutory amount *or* gross pecuniary gain. 15 U.S.C. § 78u(d)(3)(B)(i), (ii). Because the penalty provision is disjunctive, the district court permissibly calculated the penalty based solely on the fixed statutory value without reference to gross pecuniary gain.

The district court also did not have to compare the Murphys' penalties to those imposed against other defendants. A comparison to penalties imposed on other

RMR defendants would be apples to oranges—these defendants all entered consent decrees with the SEC, so their penalties resulted from bargained-for exchange. *See Vernazza v. SEC*, 327 F.3d 851, 862 (9th Cir. 2003) (comparison between defendants that litigated liability and defendants that settled is inapt). And these defendants admitted wrongdoing while the Murphys continue to dispute the wrongfulness of their conduct and have provided less-than-convincing assurances against future violations. *See id.* at 863 (noting that the defendants' "failure to grasp" the wrongful nature of their conduct and "occupations [that] present opportunities for similar future violations" distinguished them from settling defendants).

In any event, a comparison to defendants in separate actions would be inappropriate because "the circumstances vary so widely." *See Swinton v. Potomac Corp.*, 270 F.3d 794, 819 (9th Cir. 2001). The district court needed to "assess the totality of the circumstances" surrounding the Murphys' violations, *see Murphy*, 626 F.2d at 655, which requires an individualized inquiry. The district court did just that.

### b. Appellants' civil penalties do not violate the Eighth Amendment's Excessive Fines Clause

We "review the district court's determination of excessiveness de novo." *United States Currency*, 354 F.3d at 1121. A civil penalty violates the Excessive Fines Clause "if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). The Supreme Court has emphasized that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Id.* at 336. In other words, we should "grant substantial deference" to the trial court in fashioning a penalty if it is within the bounds set by the penalty statute. *Id.*

We generally consider these four factors to determine whether a penalty is grossly disproportional: "(1) the nature and extent of the underlying offense; (2) whether the underlying offense related to other illegal activities; (3) whether other penalties may be imposed for the offense; and (4) the extent of the harm caused by the offense." *Pimentel v. City of Los Angeles*, 974 F.3d 919, 921 (9th Cir. 2020). We hold that the civil penalties are not excessive.

First, the penalties are well within the statutory maximum under the Exchange Act. Congress authorized the district court to impose a fixed penalty "[f]or each violation." 15 U.S.C. § 78u(d)(3)(B)(i). As explained, "violation" is undefined, so the district court could have imposed a fixed § 15(a) penalty for each transaction that Appellants made as unregistered brokers. *See, e.g.*, *Pentagon Cap.*, 725 F.3d at 288 n.7. Appellants each made thousands of trades while associated with RMR, which would have led to multimillion-dollar penalties. *See Pimentel*, 974 F.3d at 923 (holding that court can consider "whether other penalties may be imposed for the offense" to determine excessiveness). But the district court declined to impose § 15(a) penalties against Jocelyn altogether, and calculated Sean and Gounaud's penalties based on the number of months they traded as unregistered brokers, leading to substantially lower penalties.

Second, contrary to Appellants' assertions, the violations were serious enough to warrant the penalties imposed. *Id.* at 922–23 (assessing "the nature and extent of the underlying offense" and "the extent of the harm caused by the violation"). According to Appellants, their violations did not harm any investors, and Riccardi was not harmed because he consented to the arrangement.

True, the § 15(a) violations may not have caused direct financial harm to any individuals. But § 15(a)'s registration requirement is "the keystone of the entire system of broker-dealer regulation." *Roth*, 22 F.3d at 1109. Registered brokers must abide by many regulations that ensure "requisite professional training," fair treatment of investors, and "adequate disclosure." *See Persons Deemed Not To Be Brokers*, 33 SEC Docket 652. By failing to register, Appellants undermined this important system of government oversight in the securities industry, as they embarked undetected in their bond-flipping scheme. *See Vasudeva v. United States*, 214 F.3d 1155, 1161 (9th Cir. 2000) (Violations are serious if they "undermine[] the viability of an important government program."). If every broker were to do as Appellants did, the oversight system would become unstable.

Likewise, Jocelyn's § 10(b) violations caused systemic harm. As the SEC's expert explained, circumventing retail priority and flipping bonds on the secondary market decreases issuers' initial pricing leverage and raises the cost of capital. Though the municipal bond issuers received their asking price on Jocelyn's 21 fraudulent transactions, her actions in the aggregate undermined the retail bond market, which relies on retail priority. *See id.* And Jocelyn's fraud, committed with a "knowing" degree of scienter, further shows that the nature and extent of her violations matches her penalty. *See Pimentel*, 974 F.3d at 922 ("Courts typically look to the violator's culpability" in determining excessiveness.).**[8]**

---

**[8]** The Murphys also argue that their penalties are grossly disproportional when compared to their actual pecuniary gain. The parties dispute the Murphys' pecuniary gain, but the Murphys'

### III.    We affirm the injunctions.

District courts may impose injunctions against any person that "is engaged or is about to engage in any acts" that violate the Exchange Act. 15 U.S.C. § 78u(d)(1). The SEC "had the burden of showing there was a reasonable likelihood of future violations of the securities laws." *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996) (quoting *Murphy*, 626 F.2d at 655). Like with civil penalties, the district court must "assess the totality of circumstances surrounding the defendant and his violations" using the same *Murphy* factors. *Id.* (quoting *Murphy*, 626 F.2d at 655). "The existence of past violations may give rise to an inference that there will be future violations." *Murphy*, 626 F.2d at 655.

In fashioning injunctive relief, the district court incorporated the *Murphy* factor analysis it used to determine the Murphys' civil penalties, "afford[ing] special consideration and weight to the likelihood of future violations factor." Sean "is a sophisticated investor and securities trader, who continues to operate a securities trading business." And Jocelyn's "equivocation regarding whether she will return to the securities business coupled with her family's continued involvement in it" suggested "that she may renew her professional trading and that future violations might occur." The district court thus required the Murphys to furnish for five years "a Copy of the Complaint and Final Judgment in this case" to any brokerage firm that they open or maintain an account with. Sean was also permanently enjoined "from future violations of Section

_____

violations—which caused systemic harm to securities markets—are serious enough to justify the penalties even if their pecuniary gain were minimal. *Id.*

15(a)," and Jocelyn "from further violations of Section 15(a), Section 10(b), and Rule 10b-5."

The Murphys offer two arguments for vacating the injunctions in their entirety. First, they claim that the SEC failed to prove that the Murphys are "engaged or about to engage" in conduct that violates federal securities laws because they terminated their business relationship with Riccardi and are complying with securities laws. *See* 15 U.S.C. § 78u(d)(1). Second, they say the district court impermissibly weighed credibility at the summary judgment stage by discounting their assurances against future violations. We reject both arguments.

The Murphys' current compliance with the law does not render injunctive relief unavailable. *See Murphy*, 626 F.2d at 655 ("[T]he fact that the defendant is currently complying with the securities laws does not preclude an injunction."). The reason is obvious: violators generally stop their illegal activities when under judicial scrutiny. But just because defendants may refrain from illegal activity during litigation does not mean they are unlikely to violate the securities laws again. Though the Murphys have ended their relationship with Riccardi, they remain engaged in the securities industry and the district court found that they have failed to fully appreciate the wrongfulness of their conduct. The district court thus reasonably determined that the Murphys were likely to commit future violations.

Nor did the district court make an impermissible credibility determination when it discredited the Murphys' assurances against future violations because of their "failure to completely recognize the wrongfulness of their past conduct." In *Murphy*, we rejected a similar argument. There, the defendant "violated the [registration] requirements . . . when he did not intend to do so." *Murphy*,

626 F.2d at 656. And throughout litigation, he continued to insist that he had done nothing wrong. *Id.* We held the district court was within its discretion to impose injunctive relief despite the defendant's assurances against future wrongdoing. *Id.*

The Murphys rely on *SEC v. Koracorp Industries, Inc.*, 575 F.2d 692 (9th Cir. 1978), where we reversed summary judgment on injunctive relief because the "nature and extent of the culpability of the several defendants" was "hotly disputed." *Id.* at 697. In *Koracorp*, multiple defendants were implicated in a fraudulent scheme, and there was a dispute over the "allocation of responsibility" between the defendants that depended "heavily upon the credibility" of their testimony. *Id.* at 699. We thus held that the district court could resolve these credibility issues only after an evidentiary hearing or trial. *Id.*

But unlike *Koracorp*, there is no dispute here over the Murphys' role in the RMR scheme, and their culpability is not at issue. *See Murphy*, 626 F.2d at 657 (distinguishing *Koracorp* "because there was tremendous dispute about the culpability of each of the defendants, in addition to the question of the bona fides of their statements of intent to comply"). Instead, the Murphys try to thwart injunctive relief by submitting declarations assuring the court against future violations. But "statements of reformation [are] [in]sufficient to preclude summary judgment." *Id.* at 656. Because the Murphys' assurances are contradicted by their current involvement in the securities industry and apparent failure to appreciate the wrongfulness of their past conduct,

the district court acted within its discretion by imposing injunctive relief.[9]

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

---

LEE, Circuit Judge, with whom FITZWATER, District Judge, joins, concurring:

Multifactor tests—such as the *Hansen* factors for determining who may be a "broker"—may appear alluring:

---

[9] Sean Murphy (though not Jocelyn Murphy) also challenges his injunction on the ground that by ordering him to comply with Section 15(a), the injunction is insufficiently specific and merely directs him to comply with the law. We reject this argument on the facts presented. We have "not adopted a rule against 'obey the law' injunctions per se." *F.T.C. v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012). Rather, we have recognized that "the mere fact that the injunction is framed in language almost identical to the statutory mandate does not make the language vague" so long as "the statutory terms adequately describe the impermissible conduct." *United States v. Miller*, 588 F.2d 1256, 1261 (9th Cir. 1978). In this case, the statutory terms are not impermissibly vague, and the injunction also references the district court's summary judgment decision, which provides Sean Murphy, a sophisticated actor, with additional guidance for his future conduct. To the extent Sean complains of a technical violation of Rule 65(d) because the injunction referenced materials outside the four corners of the injunction itself, Sean has not shown that he lacks access to the referenced materials or that any further relief would be warranted. *See Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126 (9th Cir. 2006) ("Ultimately, there are no magic words that automatically run afoul of Rule 65(d), and the inquiry is context specific. The fair notice requirement of Rule 65(d) must be applied in the light of the circumstances surrounding the order's entry.") (alterations and internal quotation marks omitted).

It gives judges flexibility to decide cases based on their unique facts.  And perhaps it is inevitable to rely on such factors when courts develop the details and contours of common law.  Yet we have imposed multifactor tests even when the statutory language provides sufficient guidance (as in our case here): The Securities Exchange Act defines a "broker," but courts have concocted a malleable and mushy multifactor test that provides little predictability and ultimately erodes the rule of law.[1]  I thus write separately to highlight the perils of relying on multifactor tests and recommend jettisoning the *Hansen* factors in a future case.

To start, multifactor tests "suppl[y] notoriously little guidance" to regulated parties.  *See Wooden v. United States*, 142 S. Ct. 1063, 1080 (2022) (Gorsuch, J., concurring).  It is often murky which factors are more important or how courts will balance them.  Lawyers thus often will say "it depends" or "it depends on which judge we get" when advising their clients on what the law is.  But "[r]udimentary justice requires that those subject to the law must have the means of knowing what it prescribes…. As laws have become more numerous, and as people have become increasingly ready to punish their adversaries in the courts, we can less and less afford protracted uncertainty regarding what the law may mean."  Antonin Scalia, The Rule of Law as a Law of Rules, 56 U. CHI. L. REV. 1175, 1179 (1989).  Predictability is particularly paramount when stakes are high as here— millions of dollars in fines and loss of livelihood.

---

[1] *Compare* 15 U.S.C. § 78c(a)(4)(A) (defining "broker" as "any person engaged in the business of effecting transactions in securities for the account of others" *with SEC v. Feng*, 935 F.3d 721, 731–32 (9th Cir. 2019) (applying *SEC v. Hansen*, No. 83 Civ. 3692, 1984 U.S. Dist. LEXIS 17835, at *25 (S.D.N.Y. Apr. 6, 1984) (establishing seven non-exclusive factors to determine who is a "broker")).

Multifactor tests are even less useful when they involve non-exclusive factors because they cede even more discretion to judges.  Under the *Hansen* factors, it is unclear which of the seven factors should be considered or which are more important because different courts have emphasized different factors.  *Compare EdgePoint Cap. Holdings, LLC v. Apothecare Pharm., LLC*, 6 F.4th 50, 57 n.5 (1st Cir. 2021) (receipt of "transaction-based compensation" is the "hallmark indication" of broker activity), *with SEC v. Holcom*, No. 12-cv-1623-H (JMA), 2015 U.S. Dist. LEXIS 189380, at *4 (S.D. Cal. Jan. 8 2015) ("The most important factor . . . is the regularity of participation in securities transactions."), *and SEC v. M&A West, Inc.*, No. C-01-3376 VRW, 2005 U.S. Dist. LEXIS 22452, at *27 (N.D. Cal. June 20, 2005) (entrustment with investor assets and authorization to transact for others are key factors).

And because the factors are non-exclusive, courts can ignore some factors altogether if they cut against their decisions.  It is also uncertain how many factors are enough for someone to be considered a broker under *Hansen*.  Are half enough?  Or maybe a third?  What if the most important factor (assuming there is one) is implicated but the rest of the factors are not?  We often struggle to apply such a test consistently in a way that provides meaningful guidance to regulated parties.  *See Exacto Spring Corp. v. CIR*, 196 F.3d 833, 835–38 (7th Cir. 1999) (Posner, C.J.) (lodging the same arguments against multifactor tests).

A non-exclusive multifactor test raises the same problem that Justice Scalia famously identified with legislative history: It is the "equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends."  *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) (crediting Judge Harold Leventhal

for the analogy). When a multifactor test allows judges to pick the factors they prefer and discard or ignore the ones they don't, it may seem more like a Fantasy Football draft than the rule of law.

In short, a non-exclusive multifactor test too often allows judges to decide based largely on their gut feelings—it is a fancy and dressed-up version of an "I know it when I see it" test. *Cf. Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring). We should avert our gaze from the temptations of a non-exclusive multifactor test when, as here, the statute provides enough guidance.